**UNITED STATES OF AMERICA**
**MERIT SYSTEMS PROTECTION BOARD**

| | |
|---|---|
| RICHARD ERICKSON,<br>        Appellant, | DOCKET NUMBERS<br>AT-3443-07-0016-X-1<br>AT-3443-07-0016-C-2 |
| v. | |
| UNITED STATES POSTAL SERVICE,<br>        Agency. | DATE:  March 20, 2025 |

# THIS FINAL ORDER IS NONPRECEDENTIAL[1]

Richard Erickson, Cape Coral, Florida, pro se.

Sherry Streicker, Esquire, Roderick Eves, Esquire, and Theresa M. Gegen, Esquire, St. Louis, Missouri, for the agency.

## BEFORE

Henry J. Kerner, Vice Chairman
Cathy A. Harris, Member

## FINAL ORDER

In a December 10, 2021 compliance initial decision, the administrative judge found the agency in partial noncompliance with the Board's December 31, 2013 Opinion and Order, which granted the appellant's request for corrective action under the Uniformed Services Employment and Reemployment Rights Act of 1994 (USERRA) to the extent the agency failed to demonstrate that it provided the

---

[1] A nonprecedential order is one that the Board has determined does not add significantly to the body of MSPB case law.  Parties may cite nonprecedential orders, but such orders have no precedential value; the Board and administrative judges are not required to follow or distinguish them in any future decisions.  In contrast, a precedential decision issued as an Opinion and Order has been identified by the Board as significantly contributing to the Board's case law.  *See* 5 C.F.R. § 1201.117(c).

appellant the correct amount of back pay and benefits.[2] *Erickson v. U.S. Postal Service*, MSPB Docket No. AT-3443-07-0016-C-2, Compliance File (C-2 CF), Compliance Initial Decision (CID); *Erickson v. U.S. Postal Service*, 120 M.S.P.R. 468 (2013). Accordingly, the administrative judge granted the appellant's petition for enforcement and ordered the agency to provide him the proper amount of back pay and benefits, with interest, and an explanation of its updated back pay calculations. CID at 15. For the reasons discussed below, we now find the agency in compliance and DISMISS the petition for enforcement.

## DISCUSSION OF ARGUMENTS AND EVIDENCE ON COMPLIANCE

In April 2000, the agency removed the appellant, who had been absent from work for lengthy periods while serving on active duty with the U.S. Army National Guard Reserve, for excessive use of military leave. *Erickson*, 120 M.S.P.R. 468, ¶ 2. After his removal, he re-enlisted with the National Guard and remained on active duty until December 31, 2005. *Id.*

In 2006, the appellant appealed his removal to the Board, arguing that the agency violated the nondiscrimination provision of USERRA, 38 U.S.C. § 4311. *Id.*, ¶ 3. Following two remand orders from the U.S. Court of Appeals for the Federal Circuit, which found that the agency violated 38 U.S.C. § 4311 when it fired the appellant based on his use of military leave and that he did not abandon his civilian career or waive his protections under USERRA, the administrative judge issued a December 14, 2012 remand initial decision granting the appellant's request for corrective action under USERRA and ordering the agency to cancel his removal, reinstate him, and compensate him for any loss of wages or benefits. *Erickson v. U.S. Postal Service*, MSPB Docket No. AT-3443-07-0016-M-5,

---

[2] The December 10, 2021 compliance initial decision's finding of partial noncompliance became final after neither party filed a timely petition for review with the Board. *See Erickson v. U.S. Postal Service*, MSPB Docket No. AT-3443-07-0016-C-2, Order (Mar. 3, 2023) (dismissing the appellant's petition for review of the compliance initial decision as untimely filed without good cause shown).

Remand Appeal File, Tab 18, Remand Initial Decision; *see Erickson v. U.S. Postal Service*, 636 F.3d 1353, 1357-59 (Fed. Cir. 2011); *Erickson v. U.S. Postal Service*, 571 F.3d 1364, 1369-70 (Fed. Cir. 2009). The agency petitioned for review of the remand initial decision.

In the December 31, 2013 Opinion and Order, the Board denied the agency's petition for review and affirmed the remand initial decision. *Erickson*, 120 M.S.P.R. 468, ¶ 1. In relevant part, the Board agreed with the administrative judge that the appellant was entitled to reinstatement as a remedy for agency's violation of 38 U.S.C. § 4311. *Id.*, ¶ 14. The Board further found that the appellant's failure to timely apply for reemployment did not preclude reinstatement and that his post-removal military service did not limit the period of time for which he had to be reinstated. *Id.*, ¶¶ 15-16. The Board also agreed with the administrative judge that the appellant was entitled under 38 U.S.C. § 4324(c)(2) to lost wages and benefits suffered as a result of the agency's violation of section 4311. *Id.*, ¶ 17. The Board noted that the general provisions of the Back Pay Act do not control the remedy that appellants may receive should they succeed on the merits of their USERRA claims and advised that, because a service member is expected to exercise reasonable diligence to mitigate economic damages suffered as a result of an employer's violation of USERRA, the award of lost wages and benefits must be offset by the amount the appellant should have reasonably earned during the relevant period. *Id.* The Board again ordered the agency to cancel the appellant's removal, retroactively reinstate him, and pay him the correct amount of wages and benefits lost as a result of the removal action as required under 38 U.S.C. § 4324(c)(2). *Id.*

On March 1, 2019, the appellant filed a petition for enforcement of the Board's Opinion and Order. *Erickson v. U.S. Postal Service*, MSPB Docket No. AT-3443-07-0016-C-1, Compliance File (C-1 CF), Tab 1. The agency responded, in relevant part, that it had reinstated the appellant effective April 14, 2000; calculated his back pay and benefits for each year from 2000 through 2015; and

paid him back pay in the amounts of $540 for 2001; $1,199 for 2008; and $4,258 for 2010; for a total of $5,997. C-1 CF, Tab 26 at 5-53. The agency argued that the appellant was not entitled to any more back pay because, "for all other years, he either earned more money in the military than he would have at the USPS, including all forms of pay: base pay, overtime, penalty overtime, night differential, and Sunday premium, or failed to provide the documentation necessary for the Agency and Board to make a proper determination[.]" *Id.* at 5.

In the December 10, 2021 compliance initial decision, the administrative judge found that the agency had complied with its obligation to cancel the appellant's removal, retroactively reinstate him, and properly calculate the total amount of pay he would have received during the back pay period from April 14, 2001, through January 22, 2015.[3] CID at 4-7. However, he found the agency remained in noncompliance to the extent it: (1) failed to properly pay the appellant for the military leave to which he would have been entitled while on active duty from April 14, 2000, to September 29, 2001; (2) improperly offset from the appellant's lost wages the amount he received in Basic Allowance for Subsistence (BAS), Basic Allowance for Housing (BAH), and combat pay while serving on active duty in the military; (3) improperly denied him back pay based on insufficient evidence regarding his outside earnings or mitigation efforts for certain periods; (4) failed to properly restore his sick and annual leave hours; and (5) failed to properly restore his Thrift Savings Plan (TSP) account. CID at 5-15. The administrative judge ordered the agency to pay the appellant the proper amount of

---

[3] The administrative judge noted that, although the appellant was reinstated to the agency's employment rolls, he did not return to work between the date the agency processed the reinstatement in January 2014 and January 23, 2015, because he remained on active-duty military service, and he did not return to work after January 23, 2015, due to his own volition, until January 6, 2020, when he reported to work for 1 day and then requested to retire. CID at 4-5. The administrative judge found that the appellant was not entitled to any back pay for the period from January 23, 2015, to May 15, 2020 (the date the record closed on all issues except whether the appellant mitigated his potential damages for that period). CID at 5-6.

back pay and benefits, with interest, and to provide him with an explanation of its updated back pay calculations. CID at 15-16. The administrative judge informed both parties that they could file a petition for review of the compliance initial decision no later than January 14, 2022, if they disagreed with the findings therein. CID at 17-18.

On January 21, 2022, the Board issued an acknowledgment order advising the parties that, as neither party had filed any submission within the applicable time period, the administrative judge's finding of noncompliance had become final. *Erickson v. U.S. Postal Service*, MSPB Docket No. AT-3443-07-0016-X-1, Compliance Referral File (CRF), Tab 1 at 1-2. The acknowledgment order further advised that the Board would render a final decision on the issues of compliance and directed the agency to submit evidence showing that it had complied with all actions identified in the compliance initial decision. *Id.* at 3. On February 7, 2022, the agency notified the Board that it had taken initial steps towards compliance but that additional time was required due to the complexity of the back pay award and the long time period at issue. CRF, Tab 2.

On March 21, 2022, over two months past the January 14, 2022 deadline for filing a petition for review, the appellant petitioned the Board for review of the compliance initial decision, and the agency subsequently filed a cross petition for review. *Erickson v. U.S. Postal Service*, MSPB Docket No. AT-3443-07-0016-C-2, Compliance Petition for Review File, Tabs 1, 4. In a March 3, 2023 Order, the Board dismissed the appellant's petition for review as untimely filed and held that, in the absence of a timely petition for review, it had no basis to consider the agency's cross petition for review. *Erickson v. U.S. Postal Service*, MSPB Docket No. AT-3443-07-0016-C-2, Order (Mar. 3, 2023). As the administrative judge's finding of partial noncompliance thus remained final, the Board ordered the agency to comply with the outstanding compliance obligations identified in the compliance initial decision and to submit in the compliance referral matter, MSPB Docket No.

AT-3443-07-0016-X-1, satisfactory evidence of compliance within 60 days of the date of the Order. *Id.*, ¶¶ 12-14.

On May 2 and 15, 2023, the agency submitted compliance reports reflecting that it recalculated the appellant's back pay award pursuant to the compliance initial decision. CRF, Tabs 6-7. The agency stated and provided evidence showing that it had determined the appellant was entitled to an additional $142,019.09 in gross back pay and that it paid him $67,254.46 ($142.019.09 minus $74,764.63 in deductions for retirement, social security, Medicare, Federal tax, and TSP contributions) by check dated March 29, 2023. CRF, Tab 6 at 2-4, 9-61, 96-97. The agency also stated and provided evidence showing that it determined the appellant was entitled to $119,591.56 in interest on the additional back pay payment, which it calculated using the Back Pay Calculator on the Office of Personnel Management (OPM) website. *Id.* at 7, 62-93. Additionally, the agency stated and provided evidence showing that it restored to the appellant 2,454 hours of annual leave and 1,267.71 hours of sick leave; restored his TSP contributions at a rate of 6% and provided the full agency matching and automatic (1%) contributions; paid him $2,984.93 ($4,706.78 gross pay minus $1,721.85 in deductions) for 2 fiscal years (240 hours) of military leave by check dated April 25, 2023; and paid him $8,452.29 in interest on the military leave payment by check dated May 4, 2023. CRF, Tab 6 at 5-6, 100-101, 105, Tab 7.

In a response dated June 2, 2023, the appellant argued that the agency remained in noncompliance based on various errors in its calculation of his back pay award.[4] CRF, Tab 8. The appellant stated that it was unfair he was only

---

[4] The appellant also requested that sanctions be imposed against the agency for its noncompliance. CRF, Tab 8 at 1. However, the Board lacks the authority to award punitive damages or compensatory damages in compliance cases. *Cunningham v. Department of Veterans Affairs*, 91 M.S.P.R. 523, ¶ 3 (2002). Although the Board has the authority to impose sanctions for failure to comply with any order, the Board does not award damages as a sanction. *Id.* Moreover, in view of our determination that the agency is now in compliance, the imposition of sanctions would be inappropriate. *Mercado v. Office of Personnel Management*, 115 M.S.P.R. 65, ¶ 8 (2010).

allowed 20 days to respond to the agency's compliance submission and requested additional time. *Id.* at 2. He also sought the Board's advice as to whether he could deposit the checks he had received from the agency or whether this would indicate that he agreed with the agency's calculations. *Id.* at 6. The agency replied to the appellant's response, arguing that he had failed to identify any error in its calculation of his back pay award. CRF, Tab 9.

In a February 12, 2024 Order, the Board allowed the appellant additional time to respond to the agency's prior submissions and noted that the Board does not construe depositing or cashing a check for back pay as evidence that an appellant agrees with the agency's calculations.[5] CRF, Tab 11 at 3. The Board further ordered the agency to provide additional explanation and evidence regarding its compliance. *Id.* at 3-5. The Board informed the appellant that he could respond to the agency's compliance submission within 30 days of service and that, if he did not respond, the Board might assume he was satisfied and dismiss his petition for enforcement. *Id.* at 5.

After seeking and obtaining an extension of time to respond, CRF, Tabs 13-14, the agency responded to the Board's February 12, 2024 Order on April 15 and May 20, 2024. CRF, Tabs 15, 17. The agency provided extensive additional information with detailed narrative responses and argued that it had complied with all outstanding compliance obligations. CRF, Tabs 15, 17. The appellant did not respond to the agency's submissions.

On January 10, 2025, the Board issued an Order directing the agency to provide specific additional information and evidence regarding the amounts of military pay it offset from the appellant's lost wages, proof that the $119,591.56 interest payment had been issued to the appellant, and additional details regarding its compliance with its TSP restoration obligations. CRF, Tab 18 at 3-4. The

---

[5] On April 23, 2024, the Board received a response from the appellant indicating that he had not received the Board's prior Order. CRF, Tab 16. The Office of the Clerk of the Board mailed the appellant an additional courtesy copy of the Order on or about April 26, 2024.

Board informed the appellant that he could respond to the agency's compliance submission within 14 days of service and that, if he did not respond, the Board may assume he was satisfied and dismiss the petition for enforcement. *Id.* at 4. The agency responded to the Order on January 25, 2025. CRF, Tab 19. The appellant again did not respond to the agency's submission.

## ANALYSIS

When the Board finds a personnel action unwarranted, the aim is to place the appellant, as nearly as possible, in the situation he would have been in had the wrongful personnel action not occurred. *Vaughan v. Department of Agriculture*, 116 M.S.P.R. 319, ¶ 5 (2011); *King v. Department of the Navy*, 100 M.S.P.R. 116, ¶ 12 (2005), *aff'd per curiam*, 167 F. App'x 191 (Fed. Cir. 2006). The agency bears the burden to prove compliance with the Board's order by a preponderance of the evidence.[6] *Vaughan*, 116 M.S.P.R. 319, ¶ 5; 5 C.F.R. § 1201.183(d). An agency's assertions of compliance must include a clear explanation of its compliance actions supported by documentary evidence. *Vaughan*, 116 M.S.P.R. 319, ¶ 5. The appellant may rebut the agency's evidence of compliance by making specific, nonconclusory, and supported assertions of continued noncompliance. *Id.*

As described above, the administrative judge found that the agency made several errors in its calculation and payment of the appellant's back pay award and ordered the agency recalculate the award, provide him the correct back pay and benefits with interest, and to provide him an explanation of its calculations. For the reasons that follow, we find that the agency has corrected these issues and is now in compliance.

Pay for Military Leave

The administrative judge found that, although the agency correctly determined that the appellant was not entitled to lost wages prior to September 30,

---

[6] A preponderance of the evidence is the degree of relevant evidence that a reasonable person, considering the record as a whole, would accept as sufficient to find that a contested fact is more likely to be true than untrue. 5 C.F.R. § 1201.4(q).

2001, because he was performing active-duty military service during that time, the agency failed to properly pay him for the military leave to which he would have been entitled while on active duty from April 14, 2000, to September 29, 2001. CID at 7-8. The administrative judge noted that, pursuant to the agency's Employee and Labor Relations Manual (ELM), the appellant was entitled to 15 days of paid military leave per fiscal year. CID at 7.

In its compliance submission, the agency stated and provided evidence showing that it issued the appellant a check for 30 days (240 hours) of military leave for fiscal years 2000 and 2001 on April 25, 2023, in the net amount of $2,984.93 (gross payment of $4,706.78 minus deductions for his retirement, social security, Medicare, Federal tax, and TSP contributions). CRF, Tab 7 at 5, 7-8. The agency explained that it calculated the gross total payment using the hourly rates the appellant would have earned during the relevant periods, which were determined and submitted during the earlier compliance proceeding before the administrative judge. *Id.* at 5 (citing C-1 CF, Tab 26 at 22). In a supplemental compliance submission, the agency explained that it calculated the military leave payment at an hourly rate of $19.4577 for 80 hours in fiscal year 2000 based on the appellant's hourly rate in pay period 20 of that year ($19.4577 x 80 hours = $1,556.46) and at a rate of $19.6885 for 160 hours in fiscal year 2001 based on his hourly rate in pay periods 19 (one week), 20 (two weeks), and 21 (one week) ($19.6885 x 160 hours = $3,150.16), resulting in the total gross payment of $4,706.78. CRF, Tab 15 at 4-6, 19-20. The agency also submitted evidence showing that it paid the appellant $8,452.29 in interest on the military leave payment by check dated May 4, 2023. CRF, Tab 7 at 14-22.

In response, the appellant argued that the agency underpaid him for his military leave because he was entitled to a higher hourly rate, more than 15 days of military leave per year, and to military leave pay for 1999. CRF, Tab 8 at 3-5. He also appeared to argue that the interest on the military pay should have been

calculated at a higher rate and should not have stopped accruing on April 25, 2023. *Id.* at 4.

As an initial matter, the appellant's argument that he is entitled to military leave for fiscal year 1999 is beyond the scope of the current proceeding. As described above, the administrative judge found that the appellant was entitled to pay for military leave only for the period from April 14, 2000, to September 29, 2001. CID at 6-7. Because the Board found that the appellant failed to show good cause for his untimely filed petition for review of the compliance initial decision, the administrative judge's findings became final, and the Board will not revisit his determination about the period for which the appellant must be paid for military leave now.

The appellant's challenges to the hourly rate the agency used to calculate his military leave pay are likewise beyond the scope of this proceeding. In the compliance initial decision, the administrative judge found that the agency proved by preponderant evidence that its calculation of the amount the appellant would have earned during the back pay period was correct. CID at 6-7. In relevant part, this calculation included the agency's determination that the appellant's hourly rate of pay would have been $19.46 from September 9 through November 18, 2000, and $19.69 from November 19, 2000, through November 16, 2001.[7] C-1 CF, Tab 26 at 22. Using these figures, the agency determined that the appellant was entitled to a total gross payment of $4,706.78 for the 240 hours of military leave he would have been entitled to in fiscal years 2000 and 2001, which represented an average of $19.61 per hour. CRF, Tab 7, Tab 15 at 4-6. As the administrative judge's

---

[7] Moreover, in its supplemental compliance submission, the agency provided the Postal Service Form 50 showing that the appellant's base salary was $40,472.00 effective September 9, 2000, and $40,952.00 effective November 18, 2000. CRF, Tab 15 at 19-20. The agency explained that, pursuant to the ELM, an hourly salary rate is calculated by dividing the annual salary by 2,080 and rounding it to 4 decimal places. CRF, Tab 15 at 5, 21. The agency properly did so here: the appellant's annual salary of $40,472 divided by 2,080 hours is $19.4577, and his annual salary of $40,952 divided by 2,080 hours is $19.6885.

finding that the agency's calculations regarding the appellant's hourly rate of pay for each period became final, we will not now consider any challenge to those calculations. In any event, we find no error in the agency's determination regarding the appropriate hourly rate to calculate his military leave pay or in the gross total payment he received.

The appellant further argues that he should have received more than 15 days of military leave per year for "law enforcement duty" and/or because he had a "certain number of years" of service. CRF, Tab 8 at 5. Pursuant to ELM section 517.41, full-time agency employees are entitled to 15 calendar days (120 hours) of military leave per fiscal year. Nothing in the ELM provides for additional hours of military leave for individuals with a particular number of years of service. We note that ELM section 517.72 provides for 176 hours of military leave per fiscal year if the military leave is requested for "law enforcement purposes." Here, however, there is no indication that the appellant's military service during fiscal years 2000 and 2001 was for "law enforcement purposes"; rather, the military orders in the record reflect that he was ordered to "active duty for special work (ADSW)" for the period October 1, 1999, through September 29, 2001. C-1 CF, Tab 21 at 153. Accordingly, we find no merit to his argument that he was entitled to more than 15 days of military leave per fiscal year and conclude that the agency properly paid him for the military leave he would have been entitled to in fiscal years 2000 and 2001.

Finally, the appellant argues that the agency miscalculated the interest on military leave payment by applying the incorrect interest rate and stopping interest accrual on April 25, 2023. CRF, Tab 8 at 4. The agency submitted evidence showing that it used OPM's Back Pay Calculator and its preloaded quarterly interest rates, which are provided by the Internal Revenue Service (IRS), to calculate the interest owed on the $4,706.78 military leave payment beginning on September 9, 2000, and accruing through April 25, 2023. CRF, Tab 7 at 15-22; *see* OPM Back Pay Calculator, Help Guide, https://www.opm.gov/policy-data-

oversight/pay-leave/back-pay-calculator/help/ (last visited Mar. 19, 2025). In addition, the agency provided evidence showing that the check for the interest on the military leave payment was issued on May 4, 2023, and mailed to the appellant on May 15, 2023. CRF, Tab 7 at 13-14, Tab 8 at 1-2. Considering this evidence and the lack of a specific, nonconclusory challenge to the agency's calculations, we find that the agency properly calculated and paid the appellant interest on the military leave payment. We find no merit to the appellant's general disagreement with interest rates, which were provided by IRS and preloaded into OPM's Back Pay Calculator, or with the end date of the interest accrual, which the agency properly calculated through a date less than 30 days before issuance of the interest payment. *See* 5 U.S.C. § 5596(b)(2)(B)(i) (providing that, under the Back Pay Act, interest must accrue through a date not more than 30 days before the date on which the payment is made).

For the above reasons, we find the agency in compliance with its obligation to pay the appellant for military leave he would have been entitled to for the period of April 14, 2000, through September 29, 2001, and interest on that amount.

Improper Offsets and Denials based on Insufficient Evidence

The administrative judge additionally found the agency failed to correctly calculate the back pay due to the appellant because it (1) improperly offset from the back pay award the appellant's receipt of BAS, BAH, and combat pay in 2001-2004, 2009, 2010, and 2012 through January 2015; and (2) improperly denied the appellant back pay based on insufficient evidence regarding his earnings or mitigation efforts from January 1 to December 31, 2006; January 1 to May 14, 2007; September 28, 2007, to January 27, 2008; November to December 2010; and January 1 to December 31, 2011. CID at 8-11.

The agency asserts that it has recalculated the appellant's back pay award without offsetting his receipt of BAS, BAH, or combat pay, or excluding periods for which it believed there was incomplete evidence regarding mitigation and attempts to mitigate. CRF, Tabs 6, 17, 19. In support, the agency provided

evidence and explanation showing that, based on the appellant's historical rates of pay previously approved by the administrative judge, he would have earned $688,560.30 in gross pay had he worked at the agency during the back pay period (excluding 2005 and May 15 to September 27, 2007, when he earned more from military service than he would have made at the agency). CRF, Tab 6 at 3 n.2, Tab 17 at 17-69; *see also* C-1 CF, Tab 26 at 22, CID at 6-7. From this total, the agency deducted $525,432.93 in military earnings, which it calculated using the amounts shown in the military pay chart provided by the appellant and accompanying evidence for the periods September 30, 2001, through December 31, 2004; 2006; and January 1, 2008, through January 22, 2015. CRF, Tab 6 at 102-104, Tab 17 at 6-14, 69, Tab 19 (citing C-1 CF, Tab 6). The agency also deducted $21,108.28 in prior payments made to him for military leave and the original back pay payment.[8] CRF, Tab 6 at 103. After these deductions, the agency arrived at a gross total additional back pay payment of $142,019.09.[9] CRF, Tab 17 at 5.

Following a careful review of the record, we are satisfied that the agency has complied with its obligation to calculate the appellant's outside earnings offset without including any BAS, BAH, or combat pay, or excluding any periods for insufficient evidence. The evidence reflects that, for years 2001-2002, 2006, and 2008-2015, the agency offset only the appellant's base pay or gross taxable income, which do not include BAH, BAS, or combat pay. *See* Armed Forces' Tax Guide, Internal Revenue Service Publication 3 at 7,

---

[8] The agency stated that the $21,108.28 in prior payments deducted from the total back pay award includes a February 2014 lump sum payment in the gross amount of $15,111.28 for military leave and the original back pay payment of $5,997. CRF, Tab 6 at 6, 103-04, C-2 CF, Tab 28 at 10. The appellant has not disputed that he received these amounts.

[9] From the $142,019.09 gross additional back pay award, the agency paid him $67,254.46 by check dated March 29, 2023, after deducting $74,764.63 for retirement contributions, social security, Medicare, Federal taxes, and TSP contributions payment. CRF, Tab 17 at 16.

https://www.irs.gov/pub/irs-pdf/p3.pdf (last visited Mar. 19, 2025); CRF, Tab 6 at 103-104; C-1 CF, Tab 24 at 504 (FITW-WAGE-YTD of $40,264.04 for 2001)[10], 507 (FITW-WAGE-YTD of $43,630.56 for 2002), 541 (W-2 Box 1 of $7,216.92 in 2006), 539 (W-2 Box 1 of $46,465.60 in 2008), 538 (W-2 Box 1 of $77,380.29 in 2009), 537 (W-2 Box 1 of $58,84.91 in 2010), 536 (W-2 Box 1 of $4,559.18 for 2011), 535 (W-2 Box 1 of $21,162.75 for 2012), 445-469 (leave and earnings statements base pay of $80,920.80 for 2013), 470-494 (leave and earnings statements base pay of $81,730.80 for 2014), 495-498 (leave and earnings base pay of $5,273.90 for January and February 2015).[11]  For years 2003 and 2004, the agency offset the amount shown on the Master Military Pay Account (MMPA) printouts as FICA-WAG-YTD, which appears to be the amount of the appellant's military pay that was subject to Federal Insurance Contribution Act (FICA) withholdings.  *See* CRF, Tab 6 at 103; C-1 CF, Tab 24 at 511 (FICA-WAG-YTD of $43,506.00 for 2003), 516 (FICA-WAG-YTD of $46,118.42 for 2004).  The appellant did not earn any BAS or BAH in 2003 or 2004, but did earn combat pay, which does not appear to be subject to FICA (though other pay received in a combat zone may be).  *See id.*; Department of Defense, Financial Management Regulation, Volume 7A, Ch. 45, Sec. 2.1-2.2 (March 2023), https://comptroller .defense.gov/Portals/45/documents/fmr/current/07a/07a_45.pdf.  Although it is unclear why the appellant informed the agency that his gross military pay was the amount shown at FITW-WAGE-YTD on the MMPA printouts for 2001 and 2002, but the amount shown at FICA-WAG-YTD for 2003 and 2004, we agree with the agency that it was entitled to rely on those figures pursuant to the administrative judge's order to give the appellant the benefit of the doubt.  C-1 CF, Tab 24 at 7, 504, 507, 511, 516; CRF, Tab 6 at 103-104, Tab 19 at 4-7; CID at 9-10.  In

---

[10] Outside earnings for 2001 were prorated to $12,635 as the back pay period included only September 30 to December 31, 2001.  CRF, Tab 6 at 102.

[11] FITW-WAGE-YTD refers to year-to-date wages that are subject to federal income tax withholding.  W-2 Box 1 contains the amount of taxable "wages, tips, or other compensation" received.

addition, the appellant did not respond to the agency's May 2024 or January 2025 compliance submissions clarifying its recalculation of his back pay award without offsets and exclusions, and we therefore assume he is satisfied with this aspect of the agency's compliance. *See Baumgartner v. Department of Housing and Urban Development*, 111 M.S.P.R. 86, ¶ 9 (2009).

The agency further demonstrated that the appellant was entitled to $119,591.56 in interest on the additional back pay payment and that it paid him this amount by check dated April 13, 2023. CRF, Tab 6 at 7, 62-93, Tab 19 at 51-61. The agency's evidence reflects that it utilized the OPM Back Pay Calculator and properly calculated the interest through March 29, 2023, less than 30 days before issuance of the payment. *See* 5 U.S.C. § 5596(b)(2)(B)(i). The appellant has not disputed this interest payment, and we therefore assume he is satisfied with it.

Sick and Annual Leave

The administrative judge also found that the agency failed to demonstrate compliance with its obligation to restore to the appellant the annual leave he would have earned during the periods he was *not* performing active duty military service from September 30, 2001, to January 22, 2015, and the sick leave he would have earned for the entire period. CID at 13-14.

In its May 2023 compliance submission, the agency stated and provided evidence showing that it had adjusted the appellant's sick leave balance from 4 hours to 1,272.71 hours and that it adjusted his annual leave balance from 176 hours to 2,630 hours. CRF, Tab 6 at 5, 100-01. The agency stated that the appellant arguably received an "overpayment" of annual leave because the compliance initial decision only required the agency to restore annual leave for the periods he was not on active duty in the military, but "such adjustments are automatically performed as a result of the back pay process at the Postal Service." *Id.* at 6 n.1. In response, the appellant generally disagreed with the agency's annual and sick leave calculations, stating "[t]here seems to be a huge discrepancy

in the annual leave and sick leave," but did not identify any specific inaccuracy. CRF, Tab 8 at 4.

In its April 2024 supplemental compliance submission, the agency explained that employees earn 4 hours of sick leave for every 80 hours they were paid during a leave year. CRF, Tab 15 at 7-10. The agency set forth the number of hours the appellant worked during each year of the back pay period and then divided that number by 80 to ascertain the number of 80-hour increments ("leave increments") he worked for each leave year. *Id.* After performing this calculation for each leave year, the agency determined that the appellant was entitled to 4 hours of sick leave for 314 leave increments of back pay period, which totaled 1,256 hours of sick leave. *Id.* at 9-10. The agency also credited the appellant with 12.71 hours of sick leave that he had already earned prior to his separation in 2000, resulting in a total restoration of 1,267.71 hours of sick leave. *Id.* The appellant did not respond.

We find that the agency has demonstrated compliance with its obligation to calculate and restore to the appellant the hours of sick leave he would have earned at the agency from September 30, 2001, to January 22, 2015. As described above, the agency has properly restored to the appellant 4 hours of sick leave for every 80 hours he would have worked during this period and credited him with the sick leave he had accrued prior to his separation, for a total restoration of 1,267.71 hours of sick leave. In addition, the appellant did not respond to the agency's April 2024 submission describing its sick leave restoration calculations, and we therefore assume he is satisfied. *See Baumgartner*, 111 M.S.P.R. 86, ¶ 9.

We additionally find that the agency is in compliance with its obligation to restore the appellant's annual leave. Although the agency did not provide a narrative explanation detailing its calculations, it is evident that the agency restored far more hours of annual leave to the appellant than it was required to. As noted above, the agency was only required to restore to the appellant the annual leave he would have earned during the periods he was *not* serving on active duty in the military, which was only several years of the nearly 14-year back pay period.

CID at 12-13 (noting that the appellant was on active duty from April 2, 1999, to December 31, 2005; May 15 to September 27, 2007; January 28, 2008, to September 12, 2010; May 21, 2011, to October 1, 2012; and October 2, 2012, to January 23, 2015). However, the agency restored to him 2,460 hours of annual leave, which represents an average of 7.83 hours of annual leave restored for each of the 314 "leave increments" the appellant would have accrued had he been employed by the agency throughout the back pay period. CRF, Tab 6 at 100-101, Tab 15 at 8-10. As the appellant was entitled to 6 hours of annual leave per pay period until approximately November 2001, at which time he became entitled to 8 hours of annual leave per pay period, C-1 CF, Tab 26 at 63-98, the agency's restoration of 2,460 hours represents the full amount of annual leave he would have earned had he worked at the agency throughout the back pay period, including those periods when he was on active duty. Thus, the agency exceeded its annual leave restoration obligation. In light of this evidence, and because the appellant has not identified any specific inaccuracy in the agency's restoration of his annual leave, we are satisfied with the agency's compliance.

TSP Account

Before the administrative judge, the agency argued that the appellant was not entitled to any restored TSP benefit because TSP was available in the military, the appellant did not contribute to his TSP while in the military, and it would be speculative to assume the appellant would have contributed had he been employed by the agency. C-1 CF, Tab 26 at 45-46. The administrative judge found, however, that the agency presented no evidence that active-duty service members received a comparable benefit during the back pay period and that the appellant was entitled to a presumption in his favor in light of the purpose of USERRA. CID at 14-15. Accordingly, the administrative judge concluded that the agency had not satisfied its compliance obligations with regard to TSP contributions and ordered it to do so. CID at 14-15.

Pursuant to the Federal Retirement Thrift Investment Board (FRTIB) regulations, the employing agency must give a reinstated employee who would have been eligible to contribute to his TSP account but for the erroneous separation the opportunity to submit a new contribution election for purposes of makeup contributions or to reinstate the contribution election he had on file at the time of his separation for makeup contributions. 5 C.F.R. § 1605.13(a)(2). The regulations also provide that the employee's makeup contributions must be computed before the back pay award is paid, deducted from the back pay, and submitted to the TSP record keeper; must not cause the participant to exceed the annual contribution limit(s); and must be accompanied by attributable agency matching and automatic (1%) contributions. 5 C.F.R. § 1605.13(c).

In its May 2023 compliance submission, the agency asserted that it restored the appellant's TSP contributions pursuant to his prior TSP election of 6% full agency matching. CRF, Tab 6 at 6. In support, the agency provided a Back Pay Report reflecting deductions of 6% from each pay period of the back pay period, resulting in a total of $35,754.76 deducted from his March 29, 2023 back pay check for "TSP Regular." *Id.* at 9-97. The appellant responded that his TSP "was not contributed properly" and that he "sent multiple documents to the Agency specifically explaining the amount to contribute in order to get max savings on taxes, and, to also increase what the agency would have to contribute to as well, but they refused." CRF, Tab 8 at 4.

In its April 2024 supplemental compliance submission, the agency provided evidence showing that the appellant requested by TSP Election Form TSP-1 dated February 28, 2022, a Roth (After-Tax) TSP contribution of a $550 per pay period for the back pay period. CRF, Tab 15 at 11, 38. However, as agency counsel informed him by letter dated March 25, 2022, this election could not be implemented because the Roth option was not available before June 2, 2012, and his election of $550 per pay period exceeded the contribution limits for 2001-2005 and the total back pay owed to him. *Id.* at 36. The letter further informed him that

the agency would apply the 6% election he last made while employed at the agency unless he submitted a new TSP-1 that could be effectively implemented. *Id.* at 36. The agency stated that the appellant never responded to this letter or clarified his election, so the agency proceeded to use his prior election of a 6% TSP contribution. *Id.* at 11-12; *see id.* at 31-32. The agency also provided a payroll journal and spreadsheet showing that it made 314 payments of the automatic 1% of his basic pay and 4% agency match to the appellant's TSP account. CRF, Tab 15 at 12-13, 40-85. The appellant did not respond to the agency's submission.

In its final compliance submission in January 2025, the agency stated and provided an affidavit from a Lead Systems Accountant in Payroll Services confirming that the proper amount of TSP contributions was credited and reported to the TSP agency. CRF, Tab 19 at 7, 10-11. The Lead Systems Accountant explained that the appellant's elected TSP contribution amount, along with the agency's matching and 1% automatic contributions, were transmitted to the TSP agency on the transmission date for his back pay award on April 14, 2023. *Id.* at 10. She further explained that, as reflected on the payroll journal, the deductions were sent on a pay period by pay period basis for every individual pay period during the back pay timeframe so that the TSP agency could process the retroactive breakage calculations as if the monies had been received at that time. *Id.* at 11; *see id.* at 12-50 (pay roll journal). She attested that, once the agency transmits the retroactive TSP contributions, "any and all breakage calculations are then performed solely by the TSP agency" and that "any inquiries regarding how and when these calculations were performed would need to be directed to the current TSP provider." *Id.* She concluded that the agency followed proper procedures in restoring the appellant's TSP account. *Id.* The appellant again did not respond to the agency's submission.

Based on the above-discussed evidence and explanation provided by the agency, we find that it is in compliance with its obligation to restore the appellant's TSP account. Although the appellant argued in response to the agency's first

compliance submission that the agency failed to correctly apply his new contribution election, it was his failure to submit a corrected TSP-1 election form after the agency notified him that his February 28, 2022 election could not be implemented that forced the agency to use his prior election. *See Coe v. U.S. Postal Service*, 101 M.S.P.R. 575, ¶¶ 13-14 (holding that, when an appellant does not cooperate with the agency's efforts to achieve compliance, the Board may deny the petition for enforcement), *aff'd*, 208 F. App'x 932 (Fed. Cir. 2006). Moreover, because the appellant did not respond to the agency's subsequent compliance submissions, we assume that he is satisfied with the actions it has taken regarding his TSP contributions. *See Baumgartner*, 111 M.S.P.R. 86, ¶ 9.

## CONCLUSION

In light of the foregoing, we find that the agency is now in compliance with the outstanding compliance obligations identified in the compliance initial decision and dismiss the petition for enforcement and the petition for review. This is the final decision of the Merit Systems Protection Board in these compliance proceedings. Title 5 of the Code of Federal Regulations, section 1201.183(c)(1) (5 C.F.R. § 1201.183(c)(1)).

## NOTICE TO THE APPELLANT REGARDING YOUR RIGHT TO REQUEST ATTORNEY FEES AND COSTS

You may be entitled to be paid by the agency for your reasonable attorney fees and costs. To be paid, you must meet the requirements set out at Title 5 of the United States Code (5 U.S.C.), sections 7701(g), 1221(g), or 1214(g). The regulations may be found at 5 C.F.R. §§ 1201.201, 1201.202, and 1201.203. If you believe you meet these requirements, you must file a motion for attorney fees WITHIN 60 CALENDAR DAYS OF THE DATE OF THIS DECISION. You must file your attorney fees motion with the office that issued the initial decision on your appeal.

## NOTICE OF APPEAL RIGHTS[12]

You may obtain review of this final decision.  5 U.S.C. § 7703(a)(1).  By statute, the nature of your claims determines the time limit for seeking such review and the appropriate forum with which to file.  5 U.S.C. § 7703(b).  Although we offer the following summary of available appeal rights, the Merit Systems Protection Board does not provide legal advice on which option is most appropriate for your situation and the rights described below do not represent a statement of how courts will rule regarding which cases fall within their jurisdiction.  If you wish to seek review of this final decision, you should immediately review the law applicable to your claims and carefully follow all filing time limits and requirements.  Failure to file within the applicable time limit may result in the dismissal of your case by your chosen forum.

Please read carefully each of the three main possible choices of review below to decide which one applies to your particular case.  If you have questions about whether a particular forum is the appropriate one to review your case, you should contact that forum for more information.

**(1) Judicial review in general**.  As a general rule, an appellant seeking judicial review of a final Board order must file a petition for review with the U.S. Court of Appeals for the Federal Circuit, which must be received by the court within **60 calendar days** of the date of issuance of this decision.  5 U.S.C. § 7703(b)(1)(A).

---

[12] Since the issuance of the initial decision in this matter, the Board may have updated the notice of review rights included in final decisions.  As indicated in the notice, the Board cannot advise which option is most appropriate in any matter.

If you submit a petition for review to the U.S. Court of Appeals for the Federal Circuit, you must submit your petition to the court at the following address:

U.S. Court of Appeals
for the Federal Circuit
717 Madison Place, N.W.
Washington, D.C. 20439

Additional information about the U.S. Court of Appeals for the Federal Circuit is available at the court's website, www.cafc.uscourts.gov. Of particular relevance is the court's "Guide for Pro Se Petitioners and Appellants," which is contained within the court's Rules of Practice, and Forms 5, 6, 10, and 11.

If you are interested in securing pro bono representation for an appeal to the U.S. Court of Appeals for the Federal Circuit, you may visit our website at http://www.mspb.gov/probono for information regarding pro bono representation for Merit Systems Protection Board appellants before the Federal Circuit. The Board neither endorses the services provided by any attorney nor warrants that any attorney will accept representation in a given case.

**(2) Judicial or EEOC review of cases involving a claim of discrimination**. This option applies to you only if you have claimed that you were affected by an action that is appealable to the Board and that such action was based, in whole or in part, on unlawful discrimination. If so, you may obtain judicial review of this decision—including a disposition of your discrimination claims—by filing a civil action with an appropriate U.S. district court (*not* the U.S. Court of Appeals for the Federal Circuit), within **30 calendar days** after you receive this decision. 5 U.S.C. § 7703(b)(2); *see Perry v. Merit Systems Protection Board*, 582 U.S. 420 (2017). If you have a representative in this case, and your representative receives this decision before you do, then you must file with the district court no later than **30 calendar days** after your representative receives this decision. If the action involves a claim of discrimination based on race, color, religion, sex, national origin, or a disabling condition, you may be entitled to representation by a

courtappointed lawyer and to waiver of any requirement of prepayment of fees, costs, or other security. *See* 42 U.S.C. § 2000e-5(f) and 29 U.S.C. § 794a.

Contact information for U.S. district courts can be found at their respective websites, which can be accessed through the link below:

http://www.uscourts.gov/Court_Locator/CourtWebsites.aspx.

Alternatively, you may request review by the Equal Employment Opportunity Commission (EEOC) of your discrimination claims only, excluding all other issues. 5 U.S.C. § 7702(b)(1). You must file any such request with the EEOC's Office of Federal Operations within **30 calendar days** after you receive this decision. 5 U.S.C. § 7702(b)(1). If you have a representative in this case, and your representative receives this decision before you do, then you must file with the EEOC no later than **30 calendar days** after your representative receives this decision.

If you submit a request for review to the EEOC by regular U.S. mail, the address of the EEOC is:

Office of Federal Operations
Equal Employment Opportunity Commission
P.O. Box 77960
Washington, D.C.  20013

If you submit a request for review to the EEOC via commercial delivery or by a method requiring a signature, it must be addressed to:

Office of Federal Operations
Equal Employment Opportunity Commission
131 M Street, N.E.
Suite 5SW12G
Washington, D.C. 20507

**(3) Judicial review pursuant to the Whistleblower Protection Enhancement Act of 2012**. This option applies to you only if you have raised claims of reprisal for whistleblowing disclosures under 5 U.S.C. § 2302(b)(8) or other protected activities listed in 5 U.S.C. § 2302(b)(9)(A)(i), (B), (C), or (D). If so, and your judicial petition for review "raises no challenge to the Board's

disposition of allegations of a prohibited personnel practice described in section 2302(b) other than practices described in section 2302(b)(8), or 2302(b)(9)(A)(i), (B), (C), or (D)," then you may file a petition for judicial review either with the U.S. Court of Appeals for the Federal Circuit or any court of appeals of competent jurisdiction.[13]  The court of appeals must <u>receive</u> your petition for review within **60 days** of <u>the date of issuance</u> of this decision.  5 U.S.C. § 7703(b)(1)(B).

If you submit a petition for judicial review to the U.S. Court of Appeals for the Federal Circuit, you must submit your petition to the court at the following address:

> U.S. Court of Appeals
> for the Federal Circuit
> 717 Madison Place, N.W.
> Washington, D.C. 20439

Additional information about the U.S. Court of Appeals for the Federal Circuit is available at the court's website, www.cafc.uscourts.gov.  Of particular relevance is the court's "Guide for Pro Se Petitioners and Appellants," which is contained within the court's Rules of Practice, and Forms 5, 6, 10, and 11.

If you are interested in securing pro bono representation for an appeal to the U.S. Court of Appeals for the Federal Circuit, you may visit our website at http://www.mspb.gov/probono for information regarding pro bono representation for Merit Systems Protection Board appellants before the Federal Circuit.  The Board neither endorses the services provided by any attorney nor warrants that any attorney will accept representation in a given case.

---

[13] The original statutory provision that provided for judicial review of certain whistleblower claims by any court of appeals of competent jurisdiction expired on December 27, 2017.  The All Circuit Review Act, signed into law by the President on July 7, 2018, permanently allows appellants to file petitions for judicial review of MSPB decisions in certain whistleblower reprisal cases with the U.S. Court of Appeals for the Federal Circuit or any other circuit court of appeals of competent jurisdiction.  The All Circuit Review Act is retroactive to November 26, 2017.  Pub. L. No. 115-195, 132 Stat. 1510.

Contact information for the courts of appeals can be found at their respective websites, which can be accessed through the link below:

http://www.uscourts.gov/Court_Locator/CourtWebsites.aspx.


*Gina K. Grippando*

FOR THE BOARD: _____

Gina K. Grippando
Clerk of the Board

Washington, D.C.